IN THE

# ARIZONA COURT OF APPEALS
DIVISION TWO

---

THE STATE OF ARIZONA,
*Appellee*,

*v.*

JOSE RAUL JUAREZ-ORCI,
*Appellant*.

No. 2 CA-CR 2013-0513
Filed January 30, 2015

---

Appeal from the Superior Court in Pima County
No. CR20121629001
The Honorable Kenneth Lee, Judge

**AFFIRMED IN PART; REVERSED IN PART AND REMANDED**

---

COUNSEL

Mark Brnovich, Arizona Attorney General
Joseph T. Maziarz, Section Chief Counsel, Phoenix
By Michael T. O'Toole, Assistant Attorney General, Phoenix
*Counsel for Appellee*

Lori J. Lefferts, Pima County Public Defender
By Michael J. Miller, Assistant Public Defender, Tucson
*Counsel for Appellant*

---

**OPINION**

Judge Espinosa authored the opinion of the Court, in which
Presiding Judge Miller and Chief Judge Eckerstrom concurred.

---

ESPINOSA, Judge:

¶1        After a jury trial, Jose Juarez-Orci was convicted of attempted second-degree murder, aggravated assault with a deadly weapon, two counts of aggravated assault causing temporary/substantial disfigurement, one count of aggravated assault in violation of a protection order, and one count of aggravated assault committed as an act of domestic violence, all perpetrated against his wife, J., on one occasion.  All counts were deemed "dangerous offense[s]" involving a deadly weapon or dangerous instrument, a knife.  On appeal, Juarez-Orci challenges only the trial court's jury instruction on attempted second-degree murder, arguing the instruction improperly informed the jury that it could find Juarez-Orci guilty of attempted second-degree murder if it found he knew his conduct would cause serious physical injury. We agree and reverse that conviction.

## Factual and Procedural Background

¶2        We state the facts in the light most favorable to sustaining the verdict.  *See State v. Bible*, 175 Ariz. 549, 595, 858 P.2d 1152, 1198 (1993).  Juarez-Orci and J. were married in 2007 and subsequently had three children.  They separated in March 2012, in part because Juarez-Orci did not want J. to "go out" with her friends. According to J., he was "very possessive [and] very jealous," and threatened J. that if she went out, "something would happen to . . . the children."  He also told her "he didn't want to see [her] anymore, and if he saw [her], he would beat [her] up."[1]

¶3        J. entered a domestic violence shelter, and, apparently due to fears that Juarez-Orci would take the children to Mexico and not return, she procured an order of protection.  Although she stayed at the shelter at night, she frequently went to her home

---

[1]Although not permitted into evidence at trial, J. had told Juarez-Orci that she had been seeing another man and was pregnant by him.

during the day.  In April, J. and two friends arrived at the house, and J. received a call from Juarez-Orci.  J. asked him why the front door was bolted, thereby indirectly letting him know she was home, and told him, "[Y]ou know fully well that you can't be over here."

¶4          After bringing groceries in, J. went back into the garage to close the garage door and saw Juarez-Orci pull up in his truck and get out "with a look of anger on his face."  J. stepped back into the house, closing the door between the house and the garage, and told her friends, "Call the police, he's coming," and began dialing 9-1-1 on her telephone.  At that moment, Juarez-Orci "knocked [the door] down," and "fell to the floor" from the force of his entry.  He then accosted J. repeating, "[w]e need to talk," and "grabbed [her with] force."  J. repeatedly told him to leave, but he held her by the shoulder with one hand and began to stab her with a drywall knife.[2]  The first injury was to her face.  J. tried to calm Juarez-Orci by embracing him and telling him, "I love you a lot.  I'll stay with you."  He responded that he "couldn't live . . . [w]ithout the children, . . . without his family."  He then said, "'No,' and threw [her] to the floor."

¶5          Juarez-Orci began to hit J., and then grabbed her by her hair and "slam[med]" her face against the floor "[m]any times."  J. screamed, and he pulled her head back and put the knife against her neck.  She grabbed the knife and the two began struggling over it.  At some point the knife was bent.  Juarez-Orci then got up, dragged J. by the hair to the kitchen, and began searching through the cabinets.  J. got to her feet and tried to prevent Juarez-Orci from opening the drawer containing knives.  When he opened it, J. ran out of the house and to a neighbor's house.  Juarez-Orci then left in his truck.

¶6          J. sustained "multiple lacerations" and puncture wounds.  She had an 8.5-centimeter laceration extending from her right jaw to her right ear lobe, which required multiple layers of

_____

[2] Juarez-Orci used the knife in his work installing office furniture and normally kept it in a tool bag in the back of his truck.

stiches.  She also had a neck wound that could have been lethal had it been deeper.  On her forearm, J. had an approximately two-inch cut that exposed muscle tissue and required between fifteen to twenty stitches to close.  J. further had contusions from blunt trauma, including to her forehead, and various abrasions.  Some of J.'s injuries, puncture wounds on her hands and abrasions on her forearm, were reported to be "defensive wounds."

¶7        After the attack, Juarez-Orci went to the home of E.P. and eventually told him he had gone to his wife's house and heard his wife and "a couple other women . . . talking about him," and "he kicked the door [and] ran inside."  Juarez-Orci said he and his wife argued and he remembered "cutting her on the arm."  He said he did not remember anything else.  E.P. then called 9-1-1.  He subsequently told a detective that Juarez-Orci had remembered "stabbing [J.] once in the arm" and had thought he had "stabbed her two or three times."

¶8        Police officers found blood on the kitchen floor of J.'s residence and collected two knives, including Juarez-Orci's bent, blood-stained drywall knife.  They also searched Juarez-Orci's truck and found his blood-stained shirt and blood stains on the steering wheel and elsewhere in the truck's interior.  DNA[3] from the knife blade, Juarez-Orci's shirt, and the steering wheel matched J.'s DNA. Juarez-Orci was thereafter indicted for attempted first-degree murder, aggravated assault with a deadly weapon or dangerous instrument, two counts of aggravated assault causing temporary but substantial disfigurement, first-degree burglary, aggravated assault in violation of a protection order, and aggravated assault committed as an act of domestic violence.

¶9        At trial, without objection, the court gave the following attempted second-degree murder jury instruction, in relevant part:

> The crime of attempted second degree murder requires proof that the defendant

---

[3]Deoxyribonucleic acid.

intentionally committed any act that was a step in a course of conduct that the defendant planned would end or believed would end in the commission of second degree murder.

The crime of second degree murder requires proof of one of the following: 1. The defendant intentionally caused the death of another person or 2. The defendant caused the death of another person by conduct which the defendant knew would cause death or serious physical injury.

The court also instructed the jury that:

Serious physical injury includes physical injury which creates a reasonable risk of death, or which causes serious or permanent disfigurement, serious impairment of health, or loss or protracted impairment of any bodily organ or limb.

"Physical injury" means the impairment of a physical condition.

¶10        At the conclusion of the four-day trial, the jury found Juarez-Orci guilty of attempted second-degree murder, as a lesser-included offense of attempted first-degree murder, and all counts of aggravated assault. [4]    The trial court imposed concurrent, presumptive prison terms, the longest of which is for 10.5 years.  We

---

[4]The burglary charge was dismissed after the jury was unable to reach a verdict on that charge.

have jurisdiction over his appeal pursuant to A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A)(1).[5]

## Discussion

### Standard of Review

**¶11**      Juarez-Orci argues the trial court erred by instructing the jury that it could find him guilty of attempted second-degree murder if it found he had intentionally or knowingly caused serious physical injury without causing death and asserts his conviction must be reversed on that charge. Juarez-Orci did not object to the instruction and therefore has forfeited the right to seek relief for all but fundamental, prejudicial error, and we limit our review accordingly. Ariz. R. Crim. P. 21.3(c); *State v. Henderson*, 210 Ariz. 561, ¶¶ 19–20, 115 P.3d 601, 607 (2005); *see also State v. Brown*, 233 Ariz. 153, ¶ 19, 310 P.3d 29, 36 (App. 2013) (untimely objection first raised in motion for new trial does not preserve issue for appeal). Accordingly, Juarez-Orci "'bears the burden to establish that (1) error exists, (2) the error is fundamental, and (3) the error caused him prejudice.'" *State v. James*, 231 Ariz. 490, ¶ 11, 297 P.3d 182, 185 (App. 2013), *quoting State v. Bearup*, 221 Ariz. 163, ¶ 21, 211 P.3d 684, 689 (2009).

### Attempted Second-Degree Murder Instruction

**¶12**      We review jury instructions de novo to determine whether they accurately reflect the law. *State v. Cox*, 217 Ariz. 353, ¶ 15, 174 P.3d 265, 268 (2007). A challenged instruction should be viewed in its entirety and need only be "'substantially free from error'" in order to support a conviction. *State v. Zaragoza*, 221 Ariz.

---

[5]Juarez-Orci filed a motion for a new trial or to set aside the verdict, citing *State v. Ontiveros*, 206 Ariz. 539, 81 P.3d 330 (App. 2003), and arguing the trial court erred in instructing the jury on attempted second-degree murder. The court denied the motion noting that in *Ontiveros*, unlike here, the state had argued the theory of serious physical injury.

49, ¶ 15, 209 P.3d 629, 633 (2009), *quoting Cox*, 217 Ariz. 353, ¶ 15, 174 P.3d at 268.

**¶13** Both Juarez-Orci and the state agree that the instructions given in this case "are not materially different" from those provided in *State v. Dickinson*, 233 Ariz. 527, 314 P.3d 1282 (App. 2013). The instruction at issue in *Dickinson* provided that the jury could find the defendant guilty of attempted second-degree murder if it found he had "believed [his] act was a step in the course of conduct planned to culminate in the commission of the crime of second degree murder," which offense it defined as follows:

> The crime of second degree murder has the following elements: Number one, the defendant caused the death of another person; and number two, the defendant either, A, did so intentionally or, B, knew that his conduct would cause death or serious physical injury.

233 Ariz. 527, ¶¶ 7-8, 314 P.3d at 1284-85. We determined that this instruction erroneously conveyed to the jury that the defendant could be convicted of attempted second-degree murder based on an intent to cause serious physical injury, contravening *State v. Ontiveros*, 206 Ariz. 539, ¶ 14, 81 P.3d 330, 333 (App. 2003), in which this court had found there is no offense of attempted second-degree murder in Arizona based on merely knowing conduct will cause serious physical injury. *Dickinson*, 233 Ariz. 527, ¶ 11, 314 P.3d at 1285.

**¶14** The state argues the instructions here were correct when "viewed in their entirety." It points out that, unlike the instructions in *Ontiveros*,[6] those at hand contained language from the

---

[6]In *Ontiveros*, the relevant instruction stated:

> The crime of attempted second degree murder requires proof of the following: 1. The defendant intentionally committed

attempt statute, requiring the jury to find Juarez-Orci had taken a "'step in a course of conduct that [he] planned would end or believed would end in the commission of second degree murder,' which includes causing 'the death of another.'" It also notes that the portion of the jury instruction allowing for culpability on a finding of intent to cause "serious physical injury" was directly preceded by the requirement that the defendant "'cause[] the death of another.'" According to the state,

> because the instructions told the jurors that [Juarez-Orci] had to engage in conduct he believed would 'end in the commission of second degree murder,' the jurors could not have found [Juarez-Orci] guilty if they believed he only planned on causing serious physical injury. This is because there can be no 'commission' of second-degree murder without the death of the victim.

Thus, when the instructions are read as a whole, the state argues, the phrase, "serious physical injury" is "superfluous." The state further notes the jury was instructed it could find "some instructions no longer apply" during its deliberations. And, it emphasizes it did not make this argument in *Dickinson*, but maintained instead that *Ontiveros* should be overruled. The state concludes that in *Dickinson* this court "simply did not consider" whether the instructions

---

> an act; and 2. The act was a step in a course of conduct which the defendant planned or believed would cause the death or serious physical injury of another person.

206 Ariz. 539, ¶ 5, 81 P.3d at 331 (emphasis omitted).

adequately advised the jurors of the elements of attempted second-degree murder.[7]

**¶15** The state is correct that we held the instruction given in *Dickinson* was erroneous pursuant to *Ontiveros*, without addressing the additional language in the instruction, which required proof that the defendant had engaged in "conduct planned to culminate in the commission" of murder. *Dickinson*, 233 Ariz. 527, ¶ 8, n.3, 314 P.3d at 1284, 1285 n.3. This does not mean, however, we were mistaken in finding the *Dickinson* instruction flawed. And here, as in *Dickinson*, the trial court clearly identified two alternative levels of intent when instructing the jury on the underlying offense of second-degree murder. We disagree the jury necessarily would have disregarded the portion of the instruction that referred to "serious physical injury" based on the court's accompanying instruction that attempted second-degree murder required proof Juarez-Orci had believed his actions "would end in the commission of second degree murder." The instruction did not make it clear that the jury was required to find Juarez-Orci had intended to kill J., not merely injure her, before it could find him guilty of attempted murder.

**¶16** Moreover, we do not agree the jury would have ignored the "serious physical injury" portion of the instruction because of the additional charge that some instructions may not apply. When the facts could support a finding of intent to either kill or knowingly

---

[7]The state further asserts our recent opinion in *State v. Ruiz*, 700 Ariz. Adv. Rep. 4, ¶¶ 6, 11 (Ct. App. Nov. 25, 2014), which found erroneous an instruction similar to that in *Dickinson*, "effectively presumed the instructions . . . amounted to fundamental error because they were similar to the ones given in *Ontiveros*." *See id.* (instruction stating attempted manslaughter could be proved by evidence "[a] person caused the death of another person by conduct which the defendant knew would cause death or serious physical injury" erroneously permitted jury to consider conduct defendant may have intended or believed would cause only serious physical injury).

cause serious physical injury, it is very likely the jury would have considered both alternatives provided. Thus, the words "serious physical injury" cannot be considered "mere surplusage," as the state suggests. *Cf. United States v. Brown*, 575 F.2d 746, 747 (9th Cir. 1978) (where no evidence of flight or attempted flight, references to flight in instruction "surplusage"); *see also State v. Rodriguez*, 114 Ariz. 331, 334, 560 P.2d 1238, 1241 (Ariz. 1977) (general intent instruction "surplusage" where jury received separate instruction on specific intent for crime at issue, instructions were separated by five unrelated instructions, and specific intent requirement discussed six times in closing arguments and general intent not mentioned). We agree with Juarez-Orci it is "unlikely" a jury would "ignor[e] an alternative way of committing the offense," that is, by conduct the defendant may have intended or believed would cause only serious physical injury. Accordingly, the instruction contravenes our holding in *Ontiveros* and constitutes error. *See Ontiveros*, 206 Ariz. 539, ¶ 14, 81 P.3d at 333; *see also Dickinson*, 233 Ariz. 527, ¶ 12, 314 P.3d at 1285-86; *State v. Ruiz*, 700 Ariz. Adv. Rep. 4, ¶ 11 (Ct. App. Nov. 25, 2014).

## Fundamental Error and Prejudice

**¶17** Juarez-Orci next must establish fundamental error by showing "that the error complained of goes to the foundation of his case, takes away a right that is essential to his defense, and is of such magnitude that he could not have received a fair trial." *Henderson*, 210 Ariz. 561, ¶ 24, 115 P.3d at 608. But we have held "that instructing a jury on a non-existent theory of criminal liability is fundamental error." *James*, 231 Ariz. 490, ¶ 13, 297 P.3d at 185. As in *Dickinson* and *Ruiz*, the instruction at issue here potentially "improperly relieved the State of its burden of proving an element of the offense," an error which goes to the foundation of the case, and therefore is fundamental. *State v. Kemper*, 229 Ariz. 105, ¶¶ 5–6, 271 P.3d 484, 486 (App. 2011); *see also Dickinson*, 233 Ariz. 527, ¶ 12, 314 P.3d at 1286; *Ruiz*, 700 Ariz. Adv. Rep. 4, ¶ 12.

**¶18** Given the fundamental nature of the erroneous instruction, we must determine whether Juarez-Orci has shown resulting prejudice. *See Henderson*, 210 Ariz. 561, ¶ 26, 115 P.3d at

608. "Prejudice is a fact-intensive inquiry, the outcome of which will 'depend [ ] upon the type of error that occurred and the facts of a particular case.'" *Ruiz*, 700 Ariz. Adv. Rep. 4, ¶ 13, *quoting Dickinson*, 233 Ariz. 527, ¶ 13, 314 P.3d at 1286 (alteration in *Dickinson*). A defendant must "'prove prejudice'" rather than rely on "'speculation'" to carry his burden. *Dickinson*, 233 Ariz. 527, ¶ 13, 314 P.3d at 1286, *quoting State v. Munninger*, 213 Ariz. 393, ¶ 14, 142 P.3d 701, 705 (App. 2006). He must "'show that a reasonable, properly instructed jury could have reached a different result.'" *Ruiz*, 700 Ariz. Adv. Rep. 4, ¶ 13, *quoting Dickinson*, 233 Ariz. 527, ¶ 13, 314 P.3d at 1286. As part of this analysis, we consider "'the parties' theories, the evidence received at trial and the parties' arguments to the jury.'" *Id.*, *quoting Dickinson*, 233 Ariz. 527, ¶ 13, 314 P.3d at 1286.

**¶19** The state's theory was that Juarez-Orci intended to kill J., not that he intended to cause serious physical injury or knew that his conduct would cause serious physical injury. This is clear from the prosecutor's first remarks to the jury in her opening statement: "Ladies and gentlemen of the jury, this is a case about a man who tried to kill his wife because she was leaving him." She ended her opening statement with these words: "We will ask that you find that the defendant intentionally tracked down [J.] and tried to kill her for leaving him."

**¶20** The trial evidence included testimony that Juarez-Orci had threatened to "beat [J.] up." Prior to attacking J., Juarez-Orci had asked her to stay with him, saying he loved her. To try to calm him, J. told him she would stay. The first wound Juarez-Orci inflicted was to J.'s face. He also inflicted several sizable wounds, including a wound to J.'s neck that could have been lethal had it been deeper. J. testified she believed "he was going to kill [her]."

**¶21** In closing argument, the prosecutor said Juarez-Orci "was a jealous, controlling husband, who tracked down his wife after she left him and attempted to kill her." She maintained J.'s injuries were "not just assault-type injuries. Those injuries are someone who is trying to kill a person." She asserted that J. had "saved her own life" and escaped Juarez-Orci's "attempts to kill

her," and noted he had attempted to find another knife. She then stated that the state "ha[d] shown beyond a reasonable doubt that [Juarez-Orci] was attempting to kill J.," and that it was premeditated. The state did not argue attempted second-degree murder.

¶22 In contrast, during his closing argument, Juarez-Orci's counsel urged that he had committed assault, but had not acted with premeditation or with intent to kill, stating, "all that . . . blood, the scars, the bent knife, all of that shows a violent assault. . . . But that doesn't prove that he tried to kill her during those events, or that he intended to kill her." He continued, "What you have to look at when you're gauging his intent, I believe, is the testimony of all the witnesses that the stabbing was something that was sudden." He noted the absence of "classic premeditation" statements, such as death threats or words to the effect of "if I can't have you, nobody will have you." Counsel repeatedly argued Juarez-Orci did not intend to kill J., and said: "It was terrible, but the State wants to make it look worse than it was. They want to make an assault an attempted murder." The erroneous instruction therefore related directly to Juarez-Orci's defense. *Cf. Dickinson*, 233 Ariz. 527, ¶ 22, 314 P.3d at 1288 (mistaken identity and non-involvement defenses did not implicate fundamental error in instruction, incorrect mental state); *James*, 231 Ariz. 490, ¶ 16, 297 P.3d at 186 (defenses of mistaken identity, alibi or nonuse of a weapon did not involve applicable fundamental error).

¶23 Although the evidence was sufficient to find that Juarez-Orci had intended to kill J., that was not the only possible reasonable conclusion. The jury could have based its guilty verdict solely on a finding that he had intended or knew that his conduct would cause J. serious physical injury. *See Ruiz*, 700 Ariz. Adv. Rep. 4, ¶ 18; *see also Ontiveros*, 206 Ariz. 539, ¶¶ 18-19, 81 P.3d at 334 (correctly instructed jury could have found defendant who admitted shooting victim intended to injure not kill). We are therefore unable to say beyond a reasonable doubt that the jury would have found Juarez-Orci guilty of attempted second-degree murder without the incorrect instruction. *See Ruiz*, 700 Ariz. Adv. Rep. 4, ¶ 18, *citing*

*State v. Amaya-Ruiz*, 166 Ariz. 152, 173, 800 P.2d 1260, 1281 (1990). His conviction on this charge therefore cannot stand. *Id.*

## Disposition

**¶24**　　　For all of the foregoing reasons, we reverse Juarez-Orci's conviction for second-degree murder and remand for further proceedings on that charge. His remaining convictions and sentences are affirmed.